UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


JAIME LEE GAREN,                    :    No. 1:12-cv-178
                                    :
          Plaintiff,                :
                                    :
                                    :
     v.                             :    **OPINION & ORDER**
                                    :
                                    :
OHIO DEPARTMENT OF NATURAL          :
RESOURCES, Division of Parks        :
and Recreation,                     :

          Defendant.


     This matter is before the Court on Defendant's Motion
for Summary Judgment (doc. 13), Plaintiff's response (doc. 20),
and Defendant's reply (doc. 23).  Also before the Court is
Defendant's Supplemental Authority in Support of its Motion for
Summary Judgment (doc. 24), specifically the recently issued
United States Supreme Court cases of Vance v. Ball State Univ.,
133 S. Ct. 2434 (2013) and Univ. of Tex. Sw. Med. Ctr. v.
Nassar, 133 S. Ct. 2517 (2013).  On July 10, 2013, we ordered
Plaintiff to respond (within two weeks) to Defendant's
memorandum and to specifically address the impact of these
decisions on her case (doc. 25).  Despite our directive, no
response ever was filed.  For the reasons that follow, the Court
GRANTS Defendant's motion.

1

## I.  BACKGROUND

Jamie Garen ("Garen")[1] began her employment with the Ohio Department of Natural Resources ("ODNR"), Division of Watercraft beginning April 4, 2004 and was stationed primarily at Rocky Fork Lake region (Deposition of Jamie Lee Garen (doc. 12) at 18, 20-21, 25). In that position, she interacted with Park Officers Barb Rayburn ("Rayburn"), Tom Cassity ("Cassity"), Paul Lallier ("Lallier") and Hurd Latimer ("Latimer") (id. at 26-27). Garen and these Park Officers "worked well together" (id. at 31), such that, when a Park Officer position came available, she believed "they all would have liked for me to come over there" (id. at 30). Indeed, Mark Lockhart ("Lockhart"), who then directly supervised all of the Park Officers in the Rocky Fork State Park region[2], testified that he recruited Garen on more than one occasion to transfer from Watercraft to the Division of Parks and Recreation ("DPR") to fill a vacant Park Officer position, including the one she

---

[1] We note that Plaintiff married her husband, David Garen, on July 25, 2009 (Deposition of Jamie Lee Garen (doc. 12) at 10). Many of the documents attached as exhibits to her deposition identify Plaintiff by her maiden name, Harless, by which she was known for the majority of her career with the Ohio Department of Natural Resources (id.).

[2] This region encompassed four different state parks:  Rocky Fork (Highland County), Paint Creek (Ross County), Pike Lake (Pike County) and Lake White (Pike County) (Garen dep. at 25). The parks are approximately 30 minutes apart, but the distance between Rocky Fork and Lake White is at least an hour (id. at 58).

accepted when Latimer retired (Affidavit of Mark Lockhart (doc. 15-1) ¶¶ 3, 4). So, too, did Jeff Boester ("Boester"), then Park Manager 6 at Rocky Fork (Affidavit of Jeff Boester (doc. 15) ¶¶ 1, 3), and Jon Dobney ("Dobney"), then Southern Ohio Regional Administrator and Rocky Fork Regional Manager (Affidavit of Jon Dobney (doc. 14-1) ¶¶ 1, 3). Garen became a Park Officer in the DPR on July 7, 2008 (Garen dep. at 64-65; Lockhart aff. ¶ 3).

During her first few months as a Park Officer, at Lockhart's direction Garen rode with all of the other officers in order to learn something different from each of them as to how best to perform in her new role as a "road" (versus "watercraft") officer (Garen dep. at 65, 71-72). Things went well until both Garen and Boester responded to a call involving a child being beaten by her parents at a campground (id. at 65-66). Upon arrival, they separated the child from her parents. Being relatively new, Garen sought advice from Boester on how to proceed; he suggested that she call Rayburn for advice as Rayburn had had the most experience with domestic violence situations. Rayburn arrived and advised Garen to contact "Children's Services". Meanwhile Lallier and then Cassity also arrived on scene. While Lallier apparently was silent, Cassity voiced his opinion that all parties should be arrested.

3

Following Rayburn's counsel, Garen elected to telephone Children's Service; its representative recommended that the child be separated from her parents for the weekend while an investigation was conducted. Garen went along with this plan and made no arrests. (Id. at 65-68.) After the incident, she "noticed the guys kind of acting different" (id. at 69). One evening, when giving him a ride home, Lallier told Garen he wanted to give her some "friendly" advice, which was "[y]ou better start listening to people that know what they are talking about or when you need them, they will not be there for you[]" (id.). Garen was somewhat puzzled by Lallier's remark, but she did not regard it as a threat and decided that Lallier was "just blowing smoke" (id. at 70).

On February 28, 2009 Garen sent an e-mail to Rayburn, Lockhart, Cassity and Lallier asking everyone to pitch in to help keep the office clean (id. Exh. M). It read in part, "I cleaned up please do your part and help me keep it clean. (Sorry, kind of a neat freak). . . . Thanks for your help in keeping the up stairs clean and organized[]" (id.). Cassity responded the following March 2, stating that he and Lallier "clean[ed] on a regular basis" (id.). Garen considered this response to be "nasty and petty" because it was filled with "exclamation points and capital letters" (id. at 78). She did

4

not recall if she had printed off the e-mail before she met with Lockhart to complain; Garen did tell him when they met, though, that she believed Cassity's response was born out of an ongoing dispute with Rayburn (id. at 80) and she did not want to be "in the middle of their pissing match" (id. at 81).  According to Garen, Lockhart told her that if she wanted to be a "part of the team" she needed to disassociate herself from Rayburn because Lockhart and others did not like Rayburn or consider her to be a good officer (id.).  When Garen replied that "her parents raised [her] better than that" (id.), Lockhart apparently reminded her that they had recruited her out of Watercraft and could make her life "miserable" again (id. at 81-82).[3]

When patrolling, Park Officers carried shotguns in addition to other weapons such as pistols, tasers, mace and gas (id. at 72; Lockhart aff. ¶ 5).  On one occasion, Garen visited Mike Yates, the ODNR armorer in Columbus, and returned with a long-barreled (18") shotgun that Yates had fitted with a youth stock for her (Garen dep. at 138-39).  At this time, however,

---

[3] A very disturbing set of facts involving a physical assault preceded Plaintiff's transfer from Watercraft to DPR (Garen dep. at 35-38 & Exh. E). Upon learning about what transpired, Lockhart told Garen that, "if [she] did not report it, he had to report it[]" (id. at 38).  His reporting commenced an internal investigation (id. Exh. E), with Garen acknowledging that Lockhart "had to do what he had to do" (id. at 39).  The Watercraft Officers involved all were disciplined, specifically two terminations and one three (3)-day suspension (id. Exhs. F-H).

approximately March of 2009, the Rocky Fork region Park Officers were not assigned a specific shotgun, but rather they could choose among four (Lockhart aff. ¶ 5).[4] Although the record is not precisely clear on this point, apparently the other three guns had short (14") barrels. Cassity preferred a long barrel, but did not like the youth stock on the shotgun that Garen brought back from the armorer because it would be too short for him to use. He indicated that he wanted the regular stock put back on that particular gun, or he wanted the long barrel taken off and put on a different gun that had not been fitted with a youth stock. In the end, Cassity switched barrels. This action irritated Garen, who complained to Lockhart that she, too, preferred to use a shotgun with a long barrel. She asked Lockhart to make Cassity switch the barrels back, but Lockhart told her instead to contact the armorer to see about getting a long barrel put back on the gun with the youth stock. (Garen dep. at 139-40.) When she spoke with the armorer, he responded, "You tell Cassity or Mark to put that barrel back on. They are violating Federal Law[]" (id. at 141). Garen told Lockhart what Yates said, who advised her to leave that shotgun in the locker and he would have Cassity make the switch (id.). Observing

---

[4] As Plaintiff testified, "Just basically you grab[bed] one and went and patrolled. That is how we did it[]" (Garen dep. at 142).

later that the barrel had not been switched, Garen took care of it herself and "left it at that" (id. at 141-42).  On April 17, 2009, Garen notified Lockhart that "her" shotgun was not in the locker (id. at 143).  Rayburn and Lallier each indicated that they had "their" shotguns (id.).  Cassity either had not yet reported for duty or was not scheduled that day.  Lockhart's response was that "probably one of the guys took it" (id.) and there was no need to report it missing to the Sheriff's Department (id. at 143-44).  The shotgun reappeared in the gun locker in less than a week (id. at 144), and Garen worked only two shifts without it (id. at 104).  At an April 30, 2009 meeting, specific shotguns were assigned to each of the Park Officers (id. at 151 & Exhs. U, V).

Another issue of contention between Garen and Cassity involved Cassity's display of his awards and plaques.  Garen and Cassity each had desks in the Rocky Fork region Park Office, about ten feet away from each other.  Rather than hang these items on the wall in back of his desk, he hung them on the wall behind her desk.  (Id. at 116.)  Garen did not directly ask him to remove them, but instead responded by saying, "Please don't hang them on my wall[]" (id.).  The awards and plaques eventually were moved, but not for a "long" time (id. at 117).

On April 8, 2009 Garen was on patrol when she

encountered an illegally parked car near the dam in Lake White State Park located in Pike County (id. at 56, 89-90). She described that the officers "were on high alert to watch for vehicles or bombs near dam areas" (id. at 56), so she ran the license plates on the car and discovered that the tags were fictitious (id. at 56-57). Garen called Lallier, the other officer on duty that day, for advice on how to proceed. Initially she was not able to reach him either by radio or cell phone. (Id. at 57, 91.) She then attempted to reach Rayburn, Lockhart, Boester and Dobney, all of whom were off-duty. She tried Lallier, who was patrolling Paint Creek State Park in Ross County, again on his radio, and this time was successful. (Id. at 91.) Lallier told her to call the "supervisor at home" (id. at 57), meaning Lockhart (id. at 92). She spoke with Lockhart within the next 15-20 minutes; he told her to issue citations and impound the vehicle and, if necessary, call the Pike County Sheriff for back-up. At this point Garen noticed a fisherman in the area; he acknowledged that it was his vehicle but had not transferred the tags over from a different vehicle. Garen verified this information with Pike County and chose not to cite the fisherman or impound his vehicle. (Id. at 92-94.)

Garen complained to Lockhart about Lallier being unwilling to help her but did not recall his response. Both

8

Boester and Dobney called her about the incident and she remembered that Boester told her she "did everything okay" and that there would be a meeting to talk over what happened. (Id. at 94-95.) When deposed, Garen confirmed that she did not ask Lallier to physically come assist her (id. at 95). In her first attempt to contact Lallier she stated she needed "help" and, in the second, she indicated she "ha[d] a question" (id.). She did not ever call out—in this instance or any other—a "Code 10" (officer needs assistance) or the more urgent "Code 44" (distress/emergency) over the radio (see id. at 131-32). Garen estimated that, together, Cassity and Lallier ignored her requests for help somewhere between six and twelve times in the next six-to-seven months (id. at 177-78).

On April 27, 2009, Cassity, who was also a union representative, posted to the message board on the Fraternal Order of Police's ("FOP") website. The topic was "Contract Negotiations: Physical fitness" and his remarks read in part:

> . . . . However, some are going to complain about
> something, whatever happens. I work with an officer
> that complains about working nights. This officer has
> less than a year with our division. I recall the days
> before collective bargaining. I sure appreciate what
> our negotiating teams and staff rep. have done for us!
> keep the faith gang!

(Id. Exh. P.) Garen took offense, believing she was the subject of his posting and confronted Cassity in person, who walked

away.  An apology was posted on May 25, reading:

> I have possibly offended a co-worker and wish to
> rectify that. I used an example of a percieved [sic]
> situation to put emphasis on the fact that we have it
> a lot better since collective bargaining has been the
> law.  I in no way was referring to the character of
> any of the fine co-workers I'm privileged to trust my
> life with daily. If offended I take this opportunity
> to say, I'm SORRY[.]

(Id. Exh. Q.)

On May 17, 2009, at the encouragement of her union representative, Garen sent an e-mail to Lockhart, Boester and Dobney about her upset over all the issues detailed above and her belief that Lockhart, as her immediate supervisor, was not properly addressing her concerns (id. at 105-06 & Exhs. O, R). Lockhart suggested that Garen speak directly to Cassity and Lallier in an effort to "work things out" (id. at 126).  She did, and then sent a second e-mail to Lockhart, Boester and Dobney in which she summarized what happened, a portion of which we reprint below:

> Just so you know I did what you requested.  I talked
> to Paul and Tom.  Paul and I had a great conversation
> and I feel things were accomplished.  However Tom and
> I [sic] conversations wasn't. . . . As far as I am
> concerned [I] made some progress but I am sure I will
> lose it once they (Tom and Paul) talk.  I am not
> asking for apologies[.]  I guess I did what you asked
> and we will see where it goes from there.

(Id. Exh. S.)  Boester replied by e-mail the next morning, saying:

> Thanks for making the effort.  Don't get caught up in this, focus on what you know needs to be done, the LE code of ethics, don't let another officers [sic] actions bring you down.  There are a lot of good people in this organization, learn from them.  BE PROFESSIONAL.

(Id.)  On July 18, 2009, Lockhart called a meeting at the Park Office with Garen and Cassity.  It was, in Garen's words, "Mark's way of making Tom sit and talk with me, trying to work out differences or work out why we was [sic] having issues" (id. at 157).  Because he made a traffic stop, Cassity could not attend at the time initially set.  Garen then was called to respond to a medical emergency, so she left.  (Id. at 157-58.) When she returned, Garen heard Cassity "getting really loud about [her]" and "saying that females did not need to be park officers and that he did not think I should be in this position" (id. at 158).  Garen confronted Cassity (id.).  Lockhart convened the meeting that had been scheduled, with Cassity insisting that Lallier attend as his "witness" (id. at 159). Lockhart attempted to mediate.  Cassity began to yell at Lockhart, who told him "to be quiet" (id.).  Garen then "must have said something that made him mad" (id.), because Cassity walked out, with Lallier following behind.  Lallier told Garen "to remember where [she] came from" (id.).  Lockhart quickly interjected that, "[w]e are not meaning anything bad that happened to you at [W]atercraft" (id. at 159-60).

11

Pursuant to the FOP contract, Lockhart was supposed to post a schedule twenty-eight days in advance (id. at 75-76, 170). His practice, though, was to list the shifts he wanted covered and tell the Park Officers to figure out who would work when. If the officers could not agree, he would create the schedule and the officers would choose shifts by seniority. (Id. at 75, 169-70.) Rayburn had the most seniority, followed by Cassity, Lallier and Garen. As one would expect, Rayburn typically worked the most coveted shifts and Garen the least desirable ones. (Id. at 178.) On September 10, 2009, Lockhart and Garen were discussing the upcoming schedule. When Lallier walked in, Lockhart asked him to work with Garen on it. Lallier, who made a couple of calls to Cassity, started "yelling" at Lockhart about how he was not following the contract. Then, directing his remarks to Garen, he pointed above his head and said, "That is where we are here and you are here[,]" pointing below his knees (id. at 76).

Also during the first part of September there was an occasion when patrons got lost on the horse trial at Paint Creek Camp. Off-duty and at home, Garen learned about this situation through a message sent to her husband's pager. Her husband, a volunteer firefighter, left and Garen called the Sheriff's office. (Id. at 133-34.) Because she had "d[one] training on

that trail[,]" Plaintiff offered advice to the dispatch to pass on to the deputies searching the area (id. at 134). The dispatch then asked Garen to officially respond (id.). She knew Cassity was supposed to be on duty, but apparently he signed out early (id. at 133-34). She placed a call to Lockhart to seek permission to do so, but, not hearing back immediately, Garen responded (id. at 134-35). The patrons were quickly located and she returned home (id. at 135). The next day Garen asked Lockhart if she was "in trouble" for responding (id.). He replied that she was not, and she was compensated appropriately (id. at 135-36). Rayburn and Cassity threatened to file a grievance over them not receiving call-back pay because, under the bargaining agreement, the opportunity to earn such pay is to be offered by seniority and Garen, of course, was the least senior Park Officer (id. at 135; Dobney aff. ¶ 5). In response, Dobney authorized payment to Rayburn, Cassity and Lallier as well (Garen dep. at 136; Dobney aff. ¶ 5). On September 12, 2009, Garen's husband left a voicemail message for Lockhart about the choice to award call-back pay to all of the Park Officers, to which Dobney listened (Dobney aff. ¶ 6). Dobney regarded the "tone" of the voicemail to be "disrespectful and threatening" (id.). In the message, David Garen accused Lockhart of being afraid of Cassity and said he wanted to

discuss the way Lockart was running things (Garen dep. Exh. YY). Additionally, Mr. Garen said, "I've got some information that I can pass on to some people that could probably make your day a little bad" (id.). Garen testified that she was unaware of this call until, during a meeting with Dobney and Lockhart, Dobney told her, "'You better get a hold of your husband'" (id. at 268-69). Garen also testified that, during this same meeting, Lockhart told her, "Jamie, I do not expect you to lay down and take it, but I expect you to bend over backwards and take it" (id. at 166). To what "it" referred was not clear from Garen's testimony, but among the topics discussed (other than her husband's voicemail) was scheduling (id. at 270).

On October 10, 2009 there was a Halloween event at Paint Creek State Park (id. at 179-80). The campground roads were shut down for a short period of time so that the children could go trick-or-treating (id. at 181-82). Garen encountered a patron who told her that another officer—whom she later learned was Cassity—would not allow him to drive his vehicle through the park so that he could go to work (id. at 185-86, 190-91). She was told by members of the park staff, however, that Cassity had let two other patrons drive to the camp store for ice cream (id. at 186-87, 192). Garen later confronted Cassity in public. He said something to her about "being professional" (id. at 188,

14

191).  She replied, "[d]on't lecture me on professionalism" (id. at 188, 192).  Lockhart ordered her to go stand behind his cruiser and proceeded to "yell" at her, telling her that she was not present when Cassity told the patron he could not drive through the campground and that it was not her call (id.). Garen was humiliated at being rebuked in front of her fellow officers, the park staff and the campers (id. at 189).  She walked away, composed herself inside the camp store and went out on foot patrol (id. at 189-90).  Later that evening Cassity notified Lockhart that he found Garen's patrol cruiser unlocked with the keys in the ignition (id. at 194; Lockhart aff. ¶ 7). Her shotgun and dashboard computer were inside the vehicle (Lockhart aff. ¶ 7).  Lockhart removed Garen's keys and left them with an attendant at the camp store (id.).  At some point during the remainder of her shift, Garen stopped back through the camp store, and a staff member told her that Lockhart had left her keys there (Garen dep. at 190).  Garen retrieved the keys, her spare set, and returned to foot patrol.  Lockhart called Garen to be sure that she had collected her keys.  (Id. at 190.)  Garen disputes that her cruiser was unlocked, stating "[t]o be honest, I did not know how he got my keys" (id. at 194).

Lockhart sought permission from the ODNR's central

15

office to initiate an administrative investigation regarding Garen's conduct on October 10 (Lockhart aff. ¶ 8). He obtained voluntary witness statements in addition to interviewing Garen (id. ¶¶ 8,9). In a written report dated November 16, 2009, Lockhart concluded that Garen had been insubordinate and had violated two different sections of the Park Officer Code of Conduct as well as department policy statements concerning patrol equipment and weapons security (Garen dep. Exh. GG) and recommended discipline "commensurate with the number and severity of incident/violations reported" (id. Exh. GG at 3). He sent his recommendation to DPR's Human Resources Group Manager because he did not have the authority to suspend or terminate an employee (Lockhart aff. ¶ 9). No discipline was imposed, however, because Garen applied for disability leave benefits on November 7 (Garen dep. Exh. MM).[5] She received these benefits until the State granted her request for disability retirement effective October 1, 2010 (id. at 230, 232 & Exh. QQ).

In her Complaint, Plaintiff claims she was subjected to unwelcomed sexual harassment and thus discriminated against

---

[5] In early November 2009, Garen contacted ODNR employee Paula Pickett and told her that, during her last shift, she had been so upset that she contemplated ending her life with her service pistol. Thereafter, her weapon was secured and she was scheduled for a psychological exam. She did not work again for the ODNR. (Garen dep. at 220-222.)

on the basis of her sex in violation of 42 U.S.C. § 2000e-2(a)(1) and Ohio Rev. Code § 4112.02(A) (Count I) and that she was retaliated against for engaging in protected activity, namely reporting that she was being subjected to said harassment in violation of 42 U.S.C. § 2000e-3(a) and Ohio Rev. Code § 4112.02(A) (Count II). Defendant has moved for summary judgment on both counts. It argues that case law supports its position under federal law, and that the Eleventh Amendment bars Plaintiff's claims brought under the Ohio statute (see docs. 13, 23, 24). Plaintiff concedes the merits of Defendant's argument with regard to her state law claims and has abandoned them (see doc. 20 at 1 n.1). We now consider the merits of her federal claims, and whether they can withstand a motion for summary judgment, particularly in light of the recent Supreme Court rulings in Vance and Nassar.

## II.  Summary Judgment Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking

17

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. Celotex, 477 U.S. at 331-32. As "the requirement [of the Rule] is that there be no genuine issue of material fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not

be counted." Id. Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Companies, Inc., 8 F.3d 335, 339-40 (6th Cir. 1993) (applying Anderson, 477 U.S. at 249-50; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not our role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59 (1970) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit us to assess the credibility of witnesses. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994) (citing Anderson, 477 U.S. at 255)).

## III.  Discussion

### A.  Hostile Work Environment Claim

To establish a _prima_ _facie_ case of a hostile work environment under Title VII, a plaintiff must demonstrate that:

> (1)[she] was a member of a protected class[;] (2) she was subject to unwelcome harassment[;] (3) the harassment was based on [her membership in the protected class][;] (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment[;] and (5) the defendant knew or should have known about the harassment and failed to act.

Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011) (race); see Vickers v. Fairfield Med. Ctr., 453 F.3d 757, 762 (6th Cir. 2006) (sex) (citing Clark v. United Parcel Serv., Inc., 400 F.3d 341, 347 (6th Cir. 2005) (sex)).  Defendant concedes that Garen, being female, meets the first prong of her claim of sex discrimination.  We proceed to consider whether she can meet the other four.

### (1)  Any "Harassment" of Garen Was Not Gender-Based

At the outset the Court questions whether the conduct of which Garen complains amounts to "harassment" even as that term is colloquially defined.  We are convinced, however, that any "harassment" that may have occurred is quite unrelated to Plaintiff's gender.  This case is somewhat atypical in that there is no allegation of any sexually suggestive remarks (Garen dep. at 186).  Their absence, of course, is not fatal, but

20

rather places upon Garen the onus to show that, "but for h[er] sex, [s]he would not have been the object of harassment." Simpson v. Vanderbilt Univ., 359 Fed. App'x 562, 572 (6th Cir. 2009) (citing Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000)).  This burden proves too much.

The only comment with an overt reference to gender was Cassity's statement to Lockhart, overheard by Garen when she was listening from an outside hallway, that "females did not need to be park officers" (Garen dep. at 158).  The other instances to which she refers, that we discuss in turn below, are Cassity's open disdain for Rayburn and Lallier's "friendly" advice after the domestic violence incident; Lallier's hand gesture during a discussion about shift assignment; and Lockhart's "bend over backwards" and "remember where you came from" remarks.  None bespeak gender bias.

Plaintiff testified that she "knew Tom [Cassity] and Barb [Rayburn] did not get along.  Everyone kind of knew that" (id. at 70).  She also testified that she had some inkling as to why they did not get along.  First, Garen knew that Cassity "did not like the relationship that [Rayburn] had with the [Highland County] [S]heriff's office [of which Rayburn's husband was an employee]" because "[t]hey liked her and they did not like him" (id. at 73).  Second, she acknowledged that either Cassity or

Lallier had told her that there was an incident involving the
Sheriff's office that they believed "[Rayburn] could have got
herself killed or got other people killed" (id. at 86).
Lallier's "friendly" advice consisted of telling Plaintiff to
"start listening to people that know what they are talking about
or when you need them, they will not be there for you" (id. at
69). Garen was not intimidated by his suggestion and connected
it with her choosing to follow the advice of Rayburn over
Cassity (id. at 69-70), well aware that Lallier admired Cassity.
In Plaintiff's estimation, "Paul looked up to Tom, so it was
kind of a father figure; that is how I would relate it to be.
If Tom said something, it was the gospel" (id. at 74). An
example of Cassity's influence over Lallier was evident in the
exchange between he and Garen in September when Lockhart
suggested they work together to design an agreed-upon schedule.
Plaintiff was willing so long as she could have a particular day
off; Lallier, after more than one telephone consultation with
Cassity, not only his idol but also a union representative,
became irritated with Lockhart for not crafting the schedule as
required by the FOP contract and with Garen for requesting a
preference (id. at 75). It was in this context that a six-foot
tall Lallier made a hand gesture, pointing high, indicating "we
are here" and, pointing low, "you are here" (id. at 76, 77). To

22

interpret this motion as anything other than a visual representation of their respective seniority positions is simply illogical, particularly when it is indisputably accurate.

Lockhart's remarks must be similarly interpreted. A supervisor's use of the phrases "lay down and take it" and "bend over backwards and take it" in a conversation with a subordinate is, at best, indelicate. In the Court's view, such a coarse analogy does not belong in the workplace. We do not think it suggestive of a reference to gender, however, especially considering the context in which it was made. At the meeting in question, Dobney was scolding Garen for her spouse's menacing voicemail message to Lockhart and his interference in a bargaining unit issue involving seniority, the award of call-back pay in connection with the rescue of the patrons that went missing from the horse trail at Paint Creek Camp. After Dobney left, Lockhart continued the meeting with the topic being, as Plaintiff recalled, "how they c[ould] make me miserable and the scheduling stuff" (id. at 270), at which time he used these unseemly idioms. The only reasonable conclusion that follows is that Lockhart was telling Garen, in crass but clear terms, to take her punishment without complaint. The Court perceives these remarks to be bad-mannered, but not gender-based. Finally, we consider the reference made by Lockhart that Garen

ought not forget "where [she] came from[,]" an allusion to the physical assault she experienced at the hand of her fellow officers while assigned to Watercraft.  Review of Plaintiff's deposition testimony reveals that Lockhart made this reference during the conversation in which he encouraged her to disassociate from Rayburn because Cassity and Lallier believed Rayburn was a sub-standard officer (see id. at 80-82, 86). Contrary to the intimation in counsel's memorandum in opposition, there was no reference to "Watercraft" in the meeting in which Lockhart told Garen to "bend over and take it" (see id. at 266-70).  Lacking this nexus, to infer harassment based on sex would not be rational.  As the Sixth Circuit instructs, "it is important to distinguish between harassment and discriminatory harassment in order to "'"ensure that Title VII does not become a general civility code."'"  Simpson, supra, 359 Fed. App'x at 572 (quoting Bowman, 220 F.3d at 464 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998))). Because Garen has not demonstrated that any of actions by Lallier or Lockhart were motivated by sexual bias or animus, or by Cassity save one, she cannot satisfy the necessary third element to her hostile environment claim.[6]  See id.

---

[6] Defendant urges the Court to draw the "same-actor" inference in its favor.  In the Sixth Circuit, it is permissible to draw such an inference when a plaintiff is terminated by the same person

24

**(2)  Any "Harassment" of Garen Was Not Sufficiently Severe or Pervasive**

A hostile work environment requires that the workplace be

---

who hired her with knowledge of her membership in a protected class.  Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995).  A fact-finder is not required to draw such an inference, and, in cases in which direct evidence of discrimination has been presented, it may not be appropriate to do so on summary judgment.  Wexler v. White's Fine Furniture, 317 F.3d 564, 573 (6th Cir. 2003) (en banc).  Indeed, the same-actor inference "is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact."  Id. at 574.

As discussed in more detail infra, Lockhart did not have the authority to hire (or fire) Garen, and thus, as a pure matter, the inference cannot be drawn.  Yet the principles underlying the inference do apply with regard not only to Lockhart, but also Cassity and Lallier.  Garen testified that, while in Watercraft, she worked well with Park Officers Cassity and Lallier (as well as Rayburn and Lattimer, whom she eventually replaced upon his retirement) and that they all would welcome her transfer to DPR (Garen dep. at 26-27, 30-31; Lockhart aff. ¶ 4).  Lockhart, Boester and Dobney all recruited her (Lockhart aff. ¶ 4; Boester aff. ¶ 3; Dobney aff. ¶ 3). Lockhart set in motion the internal disciplinary investigation of the deplorable conduct of the Watercraft Officers who assaulted Garen (see Garen dep. at 35-39 & Exh. E).  And finally, while a short period of time is "not an essential element" of the inference, the shorter the span, the stronger the inference.  Buhrmaster, 61 F.3d at 464.  To that end we note a time span of less than a year between Garen's transfer into DPR (July 2008) and when she assessed things starting to go "south" after the domestic violence incident (Garen dep. at 65), and one of just over a year between her transfer in and when she applied for disability retirement (November 2009).  Both periods are relatively short and thus beg the question, why would Park Officers Lockhart, Cassity and Lallier recruit Plaintiff, obviously knowing she was female, only to create an alleged hostile work environment offensive to women?  See generally Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 175 (8th Cir. 1992) (same-actor inference drawn in age discrimination case where hiring and firing less than two years apart).

"'permeated with discriminatory intimidation, ridicule, and insult that is <u>sufficiently severe or pervasive</u> to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Bowman</u>, <u>supra</u>, 220 F.3d at 463 (emphasis added) (quoting <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted)). The conduct must be evaluated from both an objective and subjective standard. At issue is whether a reasonable person would, and the victim actually did, find the environment to be abusive. <u>Id</u>. (citing <u>Harris</u>, 510 U.S. at 21-22). In determining whether the working environment is objectively hostile, we must consider the "totality of the circumstances." <u>Id</u>. Each incident "<u>standing alone</u>" need not be sufficient, but, rather, the sum of all, "taken together[,]" must be evaluated. <u>Id</u>. (quoting <u>Williams v. General Motors Corp.</u>, 187 F.3d 553, 562 (6th Cir. 1999)). Unless "extremely serious," isolated incidents "will not amount to discriminatory changes in the terms or conditions of employment." <u>Id</u>. (citing <u>Morris v. Oldham Co. Fiscal Court</u>, 201 F.3d 784, 790 (6th Cir. 2000)). Among the "appropriate factors" to contemplate are the "frequency" and "severity" of the conduct, whether it is "physically threatening or humiliating, or a mere offensive utterance" and whether it

"unreasonably" interferes with the employee's work performance. Id. (quoting Harris, 510 U.S. at 23)).

The Court acknowledges that Garen's calls to her husband and to the ODNR's Employee Assistance Program about her frustration and thoughts of suicide (Garen dep. 220-220) are relevant to determining whether, subjectively, she deemed her work environment to be hostile.  See Harris, 510 U.S. at 23. From an objective viewpoint, however, we do not believe a reasonable person would find the workplace that so overwhelmed Plaintiff to be abusive.

We turn first to the four instances involving Cassity. His reply to Garen's February, 2009 "help me keep it clean" e-mail, depicted by Plaintiff's counsel as "dripping with sarcasm" (doc. 20 at 18), says:

> I'm certainly glad you are doing YOUR part.  Paul [Lallier] and I clean on a regular basis.  Some advise they won't touch IT!!!!  Please be ADVISED, do not put boxes of items in the gun cleaning room!  Get what YOU have put in it out A.S.A.P.  I hope everyone WORKS as a TEAM.  This will enable us to be as productive as possible.  I hope EVERYONE is getting KNOWLEDGEABLE as possible as to the many facets of the profession we are hopefully performing to the absolute best of OUR ability.  Let,s [sic] have a GREAT SEASON!!!!!!

(Garen dep. Exh. M.)  As Garen testified, his answer is indeed filled with lots of exclamation points and capital letters (see id. at 78), but, on its face, reads, at best, as a note of encouragement and, at worst, a harmless retort.  Cassity's April

27

2009 posting on the FOP website likewise was innocuous. Although Garen was not identified by name, presumably it would not have been difficult for other union members to figure out to whom Cassity was referring, so the posting was not as "anonymous" as Defendant posits (see id. Exh. P).  Still, an apology was posted a month later after Garen confronted Cassity. Neither this Court nor a reasonable person would have cause to describe it, either, as "drip[ping] with sarcasm" (see doc. 20 at 18), and a missive about the benefits of collective bargaining is an entirely appropriate communication from a union representative (see Garen dep. Exh. Q).[7]  Cassity's choice to place his plaques and other awards around Garen's office workspace was childish, but, again, by an objective standard, not intimidating.  All Park Officers, Garen included, spent the majority of their shifts on patrol rather than sitting at their desk (id. at 59), so she was not perpetually enveloped by them. Moreover, this instance of bragging was completely consistent with Cassity's message that seniority—earned by time served on the job—governs in a union shop.

---

[7] Furthermore, although Garen denied "complaining" about working nights, she conceded that she had asked the other Park Officers to "work with [her]" from time to time when devising the schedule so she could avoid a shift lasting until three o'clock in the morning (Garen dep. at 111-12).

The other actions by Cassity with which Garen takes issue involve "her" shotgun. Cassity made clear his preference for a long-barreled shotgun with a regular (as opposed to a "youth") stock. His choice to switch barrels from the gun assembled for Garen by the ODNR armorer in March 2009 was unambiguously presumptuous, and his failure to switch them back as instructed left Garen justifiably irritated. She made the switch herself, though, and apparently used this shotgun until the following April 17 when she reported for duty and found it was not in the gun locker. Garen worked two shifts without it, and the shotgun she preferred was returned to the gun locker in less than a week. Garen, of course, had a variety of other weapons with her during these two shifts, and her protests to Lockhart effected a positive outcome. Up to this point in time, the four shotguns available for use by the Park Officers were "up for grabs," so to speak (see id. at 142; Lockhart aff. ¶ 5), but, in a meeting held on April 30, just two weeks later, specific shotguns were assigned to each of the Park Officers.

To Cassity's conduct we add Lallier's. See Williams v. General Motors Corp., 187 F.3d at 562-64. Garen took issue with Lallier's lack of immediate response to her in April 2009 regarding the car parked near the dam in Lake White. She was in Pike County, and he in Ross County, about 30 minutes apart.

Garen concedes that the messages she dispatched to Lallier by radio and via cell phone, respectively, were that she needed some "help" and "ha[d] a question" (id. at 95). She did not ask him to physically come assist her (id.).  Before she reached him on her third try, she already had placed calls to Rayburn, Lockhart, Boester and Dobney, all of whom were off-duty, and within twenty minutes, Lockhart returned her earlier call. Placing a call to Lockhart, of course, was precisely the advice Lallier gave to her.  Garen complained to Lockhart about her perception that Lallier was not willing to help her this time, as well as six-to-twelve times in the remaining seven months of her employment with the DPR.  She also charges that Cassity, likewise, ignored the same number of requests for help.  Yet Garen did not ever call out a Code 10 or Code 44 in any of the other instances in which she alleges that Lallier or Cassity (or both) failed to respond (id. at 131-32).  Worth mention, too, is Garen's acknowledgement that she "got along great" with local law enforcement in her role as Park Officer—meaning the Ross, Pike and Highland County Sheriff's Departments—and would call them when she needed assistance (id. at 68-69).

Garen also took offense to the hand gesture Lallier made in September 2009 to illustrate the Park Officer hierarchy. The Court agrees with defense counsel that it could be termed

30

"overly direct" (see doc. 13 at 19).   However unnecessarily dramatic, given the circumstance it was not entirely out of context.    Before he showed Plaintiff her "place" in the division, Lallier already had spoken a couple of times with Cassity, which in Garen's own words, "gave fuel to his fire" (Garen dep. at 76).  Of significance to the Court, moreover, is that Lallier actually was arguing with Lockhart about his reticence to post the schedule himself as was his responsibility.

From the Court's perspective, Lallier's most insensitive remark was his admonition to Garen to "remember where [she] came from" (id. at 159), an obvious reference to the outrageous assault she experienced by her fellow Watercraft Officers, two of whom were discharged with a third suspended. This one remark, alone, however, cannot serve to alter the terms and conditions of her employment.   See Bowman, 220 F.3d at 463 (citing Morris, 201 F.3d at 790).    Moreover, Lockhart immediately acted to ameliorate the sting of Lallier's insult, which Garen acknowledged when she testified, "Mark was covering him really quickly because he knew I took offense to that" (Garen dep. at 160).

As discussed earlier, Lockhart, too, cautioned Garen to remember her roots (see id. at 80-82, 86), but it was in the

31

context of joining "Team Lockhart, Cassity & Lallier" rather than aligning with "Team Rayburn". Plaintiff argues that Lockhart's "false disciplinary action" against her amounted to intimidation. Yet Garen knew she was placing her job in jeopardy by virtue of her outburst at the Halloween campout (see id. at 189). And while Lockhart began the process of discipline against her by asking permission to conduct an internal investigation, he had no authority to dispense a punishment stronger than a reprimand. Finally, there is no dispute that Lockhart also recommended discipline against Cassity with regard to an instance of insubordination, and against Latimer when he left his patrol cruiser running and unlocked, with all its contents—including a loaded shotgun—exposed to theft, each of which resulted in the imposition of a one-day suspension (id. at 247-49 & Exh. UU; Lockhart aff. ¶ 10 & Exh. 2).

All of these incidents, taken together, reveal a workplace environment that was less than perfect. Indeed, it would not be an exaggeration to say it suffered from certain dysfunction. As a matter of Sixth Circuit law, however, there is no merit to the assertion that it was "hostile". Garen could not put an exact date to the domestic violence call that she believes triggered the beginning of the end (see Garen dep. at 65). We turn, therefore, to the earliest dated incident, which

32

would be Cassity's so-called "nasty and petty" e-mail reply to her sent on March 2, 2009. Thus, the time period over which these events occurred was approximately seven-to-eight months. Given that span, these occurrences we have just reviewed were hardly "frequent." The slights and annoyances of which Garen complains center largely around her lack of experience as a Park Officer and her low seniority; at times her fellow officers were sympathetic to her "newbie" status, and at times they were not. Their inconsiderate behavior, however, was not "sufficiently severe or pervasive" to be actionable under the aegis of Title VII. An admonition to heed the advice of officers who "know what they are talking about" so they will be there "when you need them" (id. at 69) does not amount to a physical threat, especially when, as with the Lake White dam incident, the "supervisor at home" (id. at 57), Lockhart, returned her call within twenty minutes and the Park Manager, Boester, subsequently complimented her judgment. Nor was the twice "missing" shotgun when a panoply of other weapons—including a pistol and a taser—are available (id. at 72). A hand gesture indicating rank made in the context of choosing shifts cannot reasonably be regarded as physically humiliating. Garen's relationship with Cassity, an "outspoken" man who "let's you know where you stand with him" (id. at 74) and her relationship

33

with Lallier, who "did whatever Tom said" (id.) was sometimes acrimonious, but the interactions that she found unpleasant fall squarely within the category of "mere offensive utterances."  As a first step she was encouraged by Lockhart to try to resolve her concerns one-on-one, and was again complimented by Boester, this time for taking that step.  Such attempts at constructive intervention, even when unsuccessful, serve to undercut the existence of a workplace atmosphere "permeated" with abuse.

In Burnett v. Tyco Corp., the Sixth Circuit held that, "[u]nder the "totality of the circumstances test [of Williams v. General Motors Corp.], a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment."  203 F.3d 980, 985 (6th Cir. 2000).  The "battery" in question was the personnel manager placing a pack of cigarettes and a lighter inside the plaintiff's tank top and brassiere straps, leaving her "stunned, shocked and exposed."  Id. at 981.  The first of the two "merely offensive" remarks occurred two weeks later at a department meeting, with the same male manager offering a throat lozenge to a coughing plaintiff, saying "'[s]ince you have lost your cherry, here's one to replace the one you lost.'"  Id.  The second remark did not come from him until five months later,

34

though, when, in response to the plaintiff wearing a sweatshirt during the holiday season saying, "Deck the Malls," he commented, "[d]ick the malls, dick the malls, I almost got aroused." <u>Id</u>. Garen identifies more than three events, but they are nowhere near as egregious as the ones just described. If the workplace to which the plaintiff in <u>Burnett</u> was subject fails to qualify as abusive under <u>Williams v. General Motors Corp.</u>, the conditions Garen depicts fall even farther from the mark. Instructive, too, is the fact pattern in <u>Kelly v. Senior Centers, Inc.</u>, also measured by the collective standard in <u>Williams</u>. There the Sixth Circuit found that a hostile work environment did not exist even though the plaintiff alleged a setting full of grossly insensitive remarks and actions directed toward African-Americans generally and those specifically in his foster grandparents program.[8]  The Court noted that, "[w]hile

_____

[8] Among them were slurs about their eating habits ("the little monkeys really enjoy their bananas" and "[the pigs] only get upset when you mess with their food, don't change the menu because they got to have their chicken") and reference to them as "Jiggers" and "niggers."  Also, the restroom used by the grandparents was cleaned infrequently and the executive director of the defendant non-profit agency complained when an African-American employee used the second floor restroom reserved for management.  The same executive director referred to an African-American board member as their "token black."  And one of the jokes to which the plaintiff objected was, "[w]hat two syllable word do whites hate to hear associated with blacks?", with the punch line being "[n]eighbor." <u>Kelly v. Senior Centers, Inc.</u>, 169 Fed. App'x 423, 425, 426 (6th Cir. 2006).  As Defendant argues persuasively, the milieu in which Garen worked was far

these incidents are deplorable and offensive, they do not amount to a pervasive, aggressive, or constant course of conduct. . . . [And w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of [the plaintiff] was not a daily or even a weekly event." 169 Fed. App'x 423, 429 (6th Cir. 2006); see also Gonzalez v. Hostetler Trucking, Inc., No. 2:11-CV-137, 2013 WL 5182835, at *6 (S.D. Ohio Sept. 12, 2013) (reasonable jury could find alleged discriminatory conduct was "pervasive" when plaintiff "presented evidence that he was referred [to] in terms like 'spic,' 'wetback,' and 'wetback nigger' almost daily—sometimes multiple times per day—by multiple individuals, in the presence of other co-workers and managers") (emphasis added). The conduct alleged by Garen is far too sporadic to satisfy a benchmark of a weekly occurrence, much less daily, and she cites no cases with a comparable fact pattern that survived summary judgment. Thus, as did the Court in Kelly, we also must conclude that the harassment alleged by Plaintiff is not severe or pervasive enough to state a meritorious claim of an abusive working environment.

---

less flagrant; thus, if the work environment in Kelly was not actionable, neither is hers.

36

**(3)  The ODNR Is Not Liable for Any "Harassment" of Garen by Her Co-Workers**

Meeting the fifth and final element of her <u>prima facie</u> case also eludes Plaintiff.  The extent of an employer's liability depends upon the status of the alleged harasser.  If he is a supervisor, the defendant employer is vicariously liable for his conduct unless it establishes, as an affirmative defense, that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that the plaintiff employee "unreasonably failed to take advantage of any preventative or corrective opportunities" provided to her by her employer or to otherwise avoid harm.  <u>Faragher</u>, <u>supra</u>, 524 U.S. at 807; <u>Clark</u>, <u>supra</u>, 400 F.3d at 349.  On the other hand, if the alleged harasser is the victim's co-worker, the defendant employer is liable <u>only</u> if it was negligent in controlling working conditions, such that "it knew or should have known about the conduct and failed to stop it."  <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 759 (1998).

The alleged harassers identified by Garen are Lockhart, Cassity and Lallier.  Without question, Cassity and Lallier are Plaintiff's co-workers.  Lockhart, however, was the direct supervisor of all the Park Officers, Garen included.  When the instant motion issue was briefed initially, the Supreme Court had not yet released its decision in <u>Vance v. Ball State</u>

Univ., in which it made clear "who qualifies as a 'supervisor' [when] an employee asserts a Title VII claim for workplace harassment[.]" 133 S. Ct. 2434, 2439 (2013). "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII," the Court held, "if he or she is empowered by the employer to take tangible employment actions against the victim." Id. Under this standard, we think it clear that Lockhart, too, must be categorized as a co-worker. It is undisputed that Lockhart did not have the authority to impose discipline greater than a reprimand against any of the Park Officers. And while he could recommend the imposition of a suspension or termination to the DPR's Human Resources Group Manager, that process was by no means a pro forma act given Garen's status as a state employee and member of the FOP collective bargaining unit. Cf. Gonzalez, supra, 2013 WL 5182835, at *8. By statute, specifically O.R.C. § 1501.01(A), the ODNR's Director is the agency's appointing authority that possesses the supervisory powers articulated in Vance. See id. § 124.01(D). Thus, because Lockhart was not empowered by either the DPR or the ODNR to take "tangible employment actions" against Garen, we evaluate his conduct in a co-worker context.[9]

---

[9] Because Plaintiff did not file a memorandum as Ordered to address how the decision in Vance impacts her case (see doc. 25), the Court infers her concession on this point.

Post <u>Ellerth</u> and <u>Faragher</u>, the Sixth Circuit has opined that a defendant employer may be liable for co-worker harassment if its "'response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.'" <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 338 (6th Cir. 2008) (quoting that portion of <u>Blankenship v.</u> <u>Parke Care Ctrs., Inc.</u>, 123 F.3d 868, 872-72 (6th Cir. 1997) which remains good law)). Under this standard, the ODNR cannot be held liable. The first time Garen complained of harassment to anyone but her co-workers[10] was in early November 2009, subsequent to what would turn out to be her final shift. In response to her husband's request for her to "get help" (Garen dep. at 221), she took the following steps:

> I will tell my story and see what happens. I think it was Monday and I called Paula Pickett because that is [the] only person I knew from the [W]atercraft thing. I said, "I want to report an incident" and I told her what was going on throughout my employment with [P]arks and how I felt that I was discriminated [against] and the harassment and everything that I was going through and the reprisals. She said, "Where are you at right now?" I said, "I am home." Of course she wanted to know where the weapon was. I called EAP

---

[10] Any oral communications Garen claims to have had with Boester and Dobney fall in the category of co-worker inasmuch as she has adduced no evidence that either of them had any greater authority than Lockhart to take "tangible employment actions" against her. Furthermore, the written e-mail messages exchanged in mid-May, 2009 make no reference to "harassment" or "discrimination" (<u>see</u> Garen dep. Exhs. R, S) as did her telephone conversations, described <u>infra</u>, with Paula Pickett and Pat Enright.

> again and they got me into a doctor in Hillsboro to
> talk to.  Then that is when – I do not know Pat
> Enright [Human Resources Group Manager] or who, but I
> told my story to him; that I felt I was being
> discriminated against and everything.  Of course, I
> had discipline hanging out there.  I just said, "I can
> prove everything I am saying.  I have tapes.  I have
> the documents, I have the recordings, I know I could
> not count on nobody so I tried to document everything
> I could document."

(<u>Id</u>. at 221-22.)  Thereafter, Plaintiff was placed on
administrative leave with pay (<u>id</u>. at 222-24 & Exh. JJ), and, on
November 7, 2009, she applied for disability leave benefits (<u>id</u>.
Exh. MM), never working again for the ODNR.  The Court considers
extremely regrettable any situation in which an individual
contemplates suicide.  As a matter of law, however, we must find
that the ODNR did not know, nor could have known, of the
purported gender-based "harassment" Plaintiff alleges.  Even if
Garen had met the second, third and fourth elements of her
hostile work environment claim, she cannot meet the fifth.  A
grant of summary judgment in favor of Defendant is thus
warranted.

B. **Retaliation Claim**

To establish a <u>prima</u> <u>facie</u> case of retaliation under
Title VII, a plaintiff must demonstrate that:

> (1) [s]he engaged in activity protected by Title VII;
> (2) this exercise of protected rights was known to the
> defendant; (3) the defendant thereafter took a
> materially adverse action against the plaintiff or
> subjected the plaintiff to severe and pervasive

40

retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action.

Lindsay v. Yates, 578 F.3d 407, 418 (6th Cir. 2009) (citing Evans v. Prospect Airport Servs., Inc., 286 Fed. App'x 889, 894 (6th Cir. 2008)).  For purposes of summary judgment, Defendant had been willing to concede the first two prongs, but maintained that Garen could not establish that the "unwarranted disciplinary administrative investigation" alleged in her Complaint (doc. 1 ¶ 38) amounted to a "materially adverse action"[11] as required by the third prong.  Nor could she prove the fourth, namely the necessary causal connection between the protected activity in which she engaged and said adverse action (see doc. 13 at 26-28 and n.16).

In her memorandum in opposition, however, Plaintiff abandoned the theory set forth in her Complaint.  Garen put forth a different adverse employment action, and claims now that she "was constructively discharged when she went out on

_____

[11] To this end, Defendant cited our decision in Spence v. Potter, No. 1:07-cv-00526, 2011 WL 249479, at *4 (S.D. Ohio Jan. 26, 2011) for the proposition that the "scheduling of a pre-disciplinary hearing that never occurred" did not amount to a "materially adverse employment action."  Here, of course, a pre-disciplinary hearing was never even scheduled inasmuch as Garen already had been placed on administrative leave with pay (Garen dep. Exh. JJ) and had applied for disability leave benefits (id. Exh. MM) twelve and four days, respectively, before Lockhart sent his letter recommending discipline to DPR's Human Resources Group Manager (see id. Exh. GG).

41

disability" (see doc. 20 at 16).   Moreover, the protected activity in which she engaged was not complaints about how she was being treated, but rather her "opposition to [Lockhart's] attempts to turn Rayburn into a pariah" (see id. at 17).   In reply, Defendant does not concede any of the necessary elements with regard to Plaintiff's new theory and urges the Court to find that she falls short as to all four.

**(1)  Garen Did Not Engage in Protected Activity**

As the statute provides, one can "engage" in protected activity in two ways:

> It shall be an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added).  As our emphasis suggests, an employer may not retaliate against an employee who has "opposed" any practice made unlawful under Title VII or who has "participated" in a Title VII investigation.  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 578 (6th Cir. 2000).  Whether an employee's actions fall within the "participation" clause or the "opposition" clause is a "significant" distinction.  Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1312 (6th Cir. 1989).  Employees who "participate" in proceedings are afforded

42

"exceptionally broad protection" under the statute.  Id.  Less protection is afforded to employees who simply "oppose" practices made unlawful under Title VII.  Id. at 1312-13.  Key to a claim under the opposition clause is that the employee "reasonably believe[]" that the practice at issue be a violation of Title VII.  Johnson, 215 F.3d at 579.  Examples of protected "opposing" conduct have been delineated by the EEOC and include: (1) complaining to anyone, such as managers, union officials, fellow employees or members of the press, about allegedly unlawful practices; (2) refusing to obey an order on the basis that the employee believes it to be contrary to Title VII; or (3) objecting to the conduct of persons other than one's current employer, such as former employers, former collective bargaining agents or former fellow employees, that the employee believes to be in violation of Title VII.  Id. (citing EEOC Compliance Manual (CCH) ¶ 8006).  But, again, to receive protection, a plaintiff's opposition must actually concern conduct that she reasonably believes falls within the ambit of Title VII.  See Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007) (construing retaliation provision of the Age Discrimination in Employment Act) (citing Booker, 879 F.2d at 1313 (Title VII)).

Garen's retaliation claim obviously is brought under

43

the opposition clause.  The conduct that she opposed, however, cannot reasonably be construed to fall within the realm of conduct prohibited by Title VII.  The conversation to which Plaintiff refers occurred during a meeting she had with Lockhart after she received the so-called "nasty and petty" e-mail response from Cassity about workplace cleanliness (Garen dep. at 79-81 & Exh. M).  As the testimony excerpt below makes plain, the issue of gender, much less discrimination <u>based</u> on gender, is not present:

> A . . . . [B]ut I said I got an e-mail from Tom and, you know, basically, <u>I did not want to be in the middle of their dispute</u>.  <u>It was kind of Barb and him were going back and forth at that time</u>.  Mark kind of listened to that part.  He says, "Well, everyone has to do their part."  I said, "Okay, I have no problem with that."  He asked me—somehow between the e-mail and getting to that part, he asked, he said, "Jamie, do you want to be part of the team?"  I said, "Yes, I want to be part of the team."  He said, "<u>Well, to be a team player, you have to quit hanging out with Barb</u>."  I am sure I gave him a funny look like, "What are you talking about?"  He said, "<u>We do not like Barb.  We do not think she is a good officer.  We do not want you to have anything to do with her.  If you do, then you will not be part of the team</u>."  <u>It kind of made me mad that he said that to me</u>.  More than anything, I want to come to work and do my job and go home.  <u>I want a good working relationship with everyone</u>.  I paused for a minute.  I kind of—want me to say the exact words?

> Q  Yes.

> A  I said, "<u>I do not want to be in the middle of their pissing match</u>.  <u>I will not treat someone else bad because someone does not like her or they do not think she is a good officer.  I will not do that.  My parents raised me better than that</u>."  I said, "<u>I will</u>

> be part of the team, but I will not do it at the
> expense of someone else."

(Id. at 80-81 (emphasis added).) Nothing about this exchange concerns the gender of any of the players. As noted previously, when subsequently asked if anyone elaborated as to why the others thought Rayburn was not a good officer, Plaintiff relayed that, "[t]here was one incident with the Sheriff's department she was doing. I don't have specific details, but they said she could have got herself killed or got other people killed" (id. at 86). This explanation is not only gender-neutral, but also safety-specific, reinforcing the Court's view that there is no "female versus male" conflict here. It is merely coincidence that Rayburn and Garen are female and Cassity and Lockhart are male. A refusal to take sides in what amounts to a workplace personality conflict clearly is not actionable under the anti-retaliation provision of Title VII. That Plaintiff declined to ostracize Rayburn may have been an act of kindness on her part, but it most certainly was not protected activity. Thus, she cannot establish the first prong.

### (2) Garen Did Not Suffer a Materially Adverse Employment Action

Garen also cannot prove that the ODNR took a "materially adverse action" against her, the third essential element required to succeed on a retaliation claim. She asks

45

the Court to construe her choice to seek disability retirement as a constructive discharge. Sixth Circuit precedent, however, does not allow such an interpretation.

A number of factors must be evaluated to determine if an employer has taken steps to force its employee to resign, or, in this case, retire. They are:

> Whether a reasonable person would have feel [sic] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001) (adopting the factors articulated in Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000)). Defendant correctly points out that none of these seven factors are present here, as confirmed in part by Plaintiff's own testimony (see, e.g., Garen dep. at 125). Of course, Lockhart did seek permission to initiate an administrative investigation of Garen's conduct at the Halloween campout, but we refer again to the undeniable fact that he had no authority to actually impose discipline greater than a reprimand and could only recommend suspension or termination to the DPR's Human Resources Group Manager if he thought either

46

appropriate, a detail known to Plaintiff (see, e.g., 208-10).
Moreover, even if Garen believed that she would be disciplined
in some fashion, it was unreasonable for her to speculate that
discharge was inevitable; her union representative confirmed
with her that, at most, she might be "get some time off work . .
. like three days" given that she did not have any prior "major
incidents" (id. at 201).  See Kinamore v. EPB Elec. Util., 92
Fed. App'x 197, 205 (6th Cir. 2004) (three-day suspension did not
signal that employer sought to compel its employee's
resignation).

        Driggers v. City of Owensboro is instructive.  Officer
Lisa Driggers was informed by the City Attorney that she faced
several charges of serious misconduct[12] with fifteen other
officers ready to testify against her.  Driggers alleged she had
no choice but to resign and claimed a constructive discharge.
Upon de novo review of the trial court's grant of summary
judgment, the Sixth Circuit affirmed:

        It must be assumed that City Attorney Pace told
        Driggers she would be charged with numerous counts of
        misconduct unless she resigned. He also told her there

_____

        [12] The charges included allegations of her failure to respond
to calls, sending inappropriate e-mails, associating with an
officer who had been ordered to stay away from her, painting her
toenails at the front desk area, admitting to dishonesty, being
asleep on duty, having too much to drink off duty and sitting on
the tailgate of a pick-up truck while straddling her boyfriend.
Driggers v. City of Owensboro, 110 Fed. App'x 499, 505 (6th Cir.
2004).

were 15 witnesses who would testify against her, <u>implying that if she did not resign, it would be difficult for her to avoid some form of discipline that might include dismissal</u>. It does not follow, however, that Driggers' only alternative at that point was to resign. Although her prospect of avoiding some form of discipline appeared to be nil, <u>it was speculative for her to conclude that the inevitable result of disciplinary charges before the City Commission would be her termination</u>. By state law, Driggers could not be dismissed or disciplined without first, the formal filing of charges against her; and second, a hearing before the City Commission, which would have had to decide whether Driggers was guilty of the charged misconduct and then impose the appropriate penalty.  [Citation omitted.]  The hearing before the City Commission, an administrative body acting in a quasi-judicial capacity, would have carried a presumption of fairness and correctness. [Citation omitted.]  As evidenced by the following statement made by Driggers in a letter she wrote to her attorney, Driggers knew that she had the option of challenging the charges against her, but instead she voluntarily chose to resign: "I have defenses to all of the 'charges' against me but it all seems to come down to whether or not I want to work there anymore. I do not. . . . Therefore, . . . I am willing to resign." <u>By resigning, Driggers cut-short her right to due process and an objective assessment of the facts. Thus, a reasonable jury could not infer from Driggers' meeting with Pace that she had no alternative but to quit the force and sue</u>.

110 Fed. App'x 499, 506-07 (6th Cir. 2004) (emphasis added) (citing <u>Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co.</u>, 121 F.3d 416, 421 (8th Cir. 1997) ("To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving h[er] employer a reasonable chance to work out a problem has not been constructively discharged.")).

Under this standard, Plaintiff definitely was not constructively discharged. As Defendant notes, Officer Garen's situation was far less "perilous" than Officer Drigger's, as the infractions with which Garen was charged were substantially less grave. She, too, was entitled to due process protection by virtue of being a state employee and a member of the FOP collective bargaining unit. Further, her union representative, an individual presumably quite familiar with patterns of discipline, advised her that "[t]hey could [impose a minimum suspension]. Did not mean they had to. If they really wanted to, I would get three days. I never really found out" (Garen dep. at 210). No reasonable person in Garen's position could have believed that discharge was imminent. Plaintiff, therefore, cannot establish the third prong central to a claim of retaliation, a "materially adverse action" by her employer.[13]

**(3) Garen Cannot Meet <u>Nassar</u>'s "But-For" Causation Standard**

At the time this issue originally was briefed by the parties, the Supreme Court had not yet released its decision in

---

[13] We agree with Defendant that <u>Benaugh v. Ohio Civil Rights Comm'n</u>, 278 Fed. App'x 501 (6th Cir. 2008) is inapposite. <u>Benaugh</u> is a disability discrimination case in which the OCRC was accused of failing to accommodate its employee's respiratory conditions of asthma and sarcoidosis. In that circumstance, the Sixth Circuit recognized that an employee's choice to opt for disability retirement might be regarded as reasonable and thus tantamount to a constructive discharge. <u>Id</u>. at 512. The case at bar involves neither a claim of disability nor a failure to accommodate.

_Univ. of Tex. Sw. Med. Ctr. v. Nassar_, 133 S. Ct. 2517 (2013). That Opinion makes clear the causation standard that now applies to Title VII's anti-retaliation provision. As Justice Kennedy wrote, "The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under §2000e-3(a) must establish that his or her protected activity was a _but-for_ cause of the alleged adverse action by the employer." _Id_. at 2534 (emphasis added). In light of the unequivocal ruling in _Nassar_, it is evident that Garen cannot establish a causal connection between her alleged protected activity and the ODNR's alleged materially adverse action.

Garen testified that she told Lockhart during a meeting in March 2009 that she would not snub Rayburn (_see_ Garen dep. at 81). She also testified that she did not "hang out" or "align" herself with Rayburn (_id_. at 84). And while the exact date of her departure is unclear, Garen testified that Rayburn had retired _before_ October 10, the date Lockhart called into question Garen's conduct at the Halloween campout. Thus, the issue of Garen declining to go along with Lockhart's admonition to not "have anything to do with [Rayburn]" would have been moot and therefore could not be the cause for the administrative investigation he commenced. This discussion is predicate, of course, on the theory that a failure to disassociate from

Rayburn actually was protected activity, a premise on which we proceed for argument's sake only.

But suppose Rayburn had still been on the job.  In the wake of Nassar, the Second Circuit has held that, "the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity." Zann Kwan v. The Andalex Group LLC, 737 F.3d 834, 845 (2d Cir. 2013) (emphasis added).  There, the plaintiff complained to the defendant's chief operations officer that she believed she was being treated differently based on her gender; she was terminated by defendant's chief investment officer three weeks later.  Id. at 838-39.  The court determined that that "three-week period" was "sufficiently short to make a prima facie showing of causation indirectly through temporal proximity." Id. at 845.

The time lapse between Garen's statement to Lockhart in March and the Halloween campout was about seven months, hardly proximate.  Nguyen v. City of Cleveland, 229 F.3d 559, 566-67 (6th Cir. 2000) ("[T]he time lag to which [plaintiff] pointed was seven months, which 'does not necessarily support an inference of a causal link; previous cases that have permitted a prima facie case to be made based on the proximity of time have

51

all been short periods of time, usually less than six months.'"
(quoting and construing <u>Parnell v. West</u>, No. 95-2131, 1997 WL
271751, at *3 (6th Cir. May 21, 1997)); <u>see</u> <u>Hamilton v. Starcom</u>
<u>Mediavest Group, Inc.</u>, 522 F.3d 623, 630 (6th Cir. 2008) (nine-
month time lapse too great to establish a <u>prima</u> <u>facie</u> case of
causation and thus withstand summary judgment (applying
<u>Nguyen</u>)).

 Moreover, the Sixth Circuit, by which this Court is
bound, has counseled pre-<u>Nassar</u> that a totality of the
circumstances approach is almost always indicated, even in fact
patterns, unlike this one, with "extremely close" temporal
proximity.  <u>See</u> <u>Vereecke v. Huron Valley Sch. Dist.</u>, 609 F.3d
392, 400-01 (6th Cir. 2010).  No other circumstances compel the
conclusion that Garen's putative allegiance to Rayburn played <u>a</u>
motivating factor much less <u>the</u> motivating factor in Lockhart's
decision to initiate the administrative investigation that
preceded Plaintiff's disability retirement.  <u>See</u> <u>Rattigan v.</u>
<u>Holder</u>, Civil Action No. 04-2009 (ESH), 2013 WL 5834481, at *9
(D.D.C. Oct. 31, 2013).  In <u>Rattigan</u>, an FBI agent was
"referred" for an investigation that ended with a finding that
he posed "no security risk present relative to the issues of
allegiance, foreign influence, or personal conduct."  <u>Id</u>. at *2
(quoting <u>Rattigan v. Holder</u>, 643 F.3d 975, 979 (D.C. Cir.

2011)).  He sued under Title VII, and, after extensive motion practice, only his retaliation claim remained.  A jury returned a verdict in his favor, which was vacated on appeal and affirmed on rehearing.  The matter was remanded, but subsequent to the remand, Nassar was decided.  The defendant filed a motion for summary judgment, arguing in part that the plaintiff could not prove the third element of his claim, specifically that his employer made the referral "because" he engaged in protected activity.[14]  In fashioning its decision, the district court noted that the appellate court had determined that a number of the allegations contained within the referral were "objectively true."  Id. at *9.  In this circumstance and bound by Nassar, the trial judge opined, "[g]iven the presence of unrebutted facts that implicated legitimate security concerns, it would be impossible for a jury to conclude that retaliatory animus was the but-for cause of the referral."  Id. at *10 (emphasis added).

We reach a similar conclusion in the case at bar.  To cite but one example, Garen acknowledged in her deposition testimony that she approached Cassity at the Halloween campout

---

[14] An FBI agent obviously is a federal employee, and Title VII's ban on retaliation applies pursuant to 42 U.S.C. § 2000e-16.  Rattigan, 2013 WL 5834481, at *5.  The third prong that a federal employee must establish is a combination of the second and fourth prongs that a private sector employee must prove. See McGrath v. Clinton, 666 F.3d 1377, 1379-80 (D.C. Cir. 2012).

and that approach began the confrontation between them over the patron headed to work (Garen dep. at 188).  Lockhart, as immediate supervisor, intervened, and Garen continued the argument with him:

> He started telling me about, "What does the sign say?" and all that stuff.  I said, "It says, Road Closed." I said, "If you let two people go get ice cream that drove up, why not someone that is actually trying to make a living for his family?  Yell if you want. Lecture.  But he was already through the campground where he was not supposed to be driving.  Let him go to work."  He said, "That ain't your call.  You were not here."  I kept saying, "Yes, Mark.  Yes, Mark." He just kept yelling at me.  Everyone is looking at me.  It seemed like forever he was yelling at me in front of everyone. . . .
> . . . Everyone was just – they all knew I was getting my butt ripped by my boss.  I was trying to leave a hostile situation, in my opinion, because I knew either I get away or something bad – I was going to say something to cost my job . . . .  Started to walk away and Mark yelled at me.  I did not respond, I just kept walking.  He said, "Officer Garen."  He said, "Officer Garen."  I walked straight back to the camp store and went into the manager's room in the camp store and sat down.  Gathered my composure.  Once I got a hold of myself and got calmed down, I then turned and went out and patrolled the rest of the evening . . . .

(Id. at 188-89.)  In his recommendation of discipline, Lockhart concluded, among other things, that Garen's behavior toward him was conduct unbecoming of an officer and insubordinate (see id. Exh. GG at 2-3).  While this Court makes no judgment as to whether Garen's conduct warranted discipline, we do determine, based on Plaintiff's own testimony, that portions of the

allegations made by Lockhart in his written summary were "objectively true," and thus a jury could not reasonably determine that retaliatory animus was the but-for cause of the investigation. Under Nassar, then, Plaintiff cannot establish the fourth prong essential to prove her claim of retaliation, and thus it cannot withstand Defendant's challenge on summary judgment.

**IV.  Conclusion**

Because Plaintiff Jamie Lee Garen has failed to meet her prima facie case with regard to both her claims of sex discrimination under 42 U.S.C. § 2000e-(2) (Count I) and retaliation under 42 U.S.C. § 2000e-(3) (Count II), Defendant Ohio Department of Natural Resources, Division of Parks and Recreation is entitled to summary judgment on them.  As noted earlier, Plaintiff has abandoned her claims of sex discrimination and retaliation under O.R.C. § 4112.02(A).  The Court thus GRANTS Defendant's Motion for Summary Judgment (doc. 13) and this matter is now closed on the docket.

SO ORDERED.


Dated:  February 18, 2014   s/S. Arthur Spiegel
                            S. Arthur Spiegel
                            United States Senior District Judge